CATSKILL MOUNTAINS CHAPTER OF TROUT UNLIMITED, INC., Theodore Gordon Flyfishers, Inc., Catskill–Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc. and Riverkeeper, Inc., Plaintiffs–Appellants,

v.

The CITY OF NEW YORK, New York City Department of Environmental Protection and Joel A. Miele, Sr., Commissioner of Department of Environmental Protection, Defendants–Appellees.

Docket No. 00–9447.

United States Court of Appeals, Second Circuit.

Argued May 25, 2001.

Decided Oct. 23, 2001.

Karl S. Coplan, Pace Environmental Litigation Clinic, Inc. (Basil B. Seggos, on the brief), White Plains, NY, for Appellants.

Ellen S. Ravitch, Office of the Corporation Counsel of the City of New York (Michael D. Hess, Stephen J. McGrath, Hillary Meltzer, and William S. Plache, on the brief), New York, NY, for Appellees.

Before: WALKER, Chief Judge, KATZMANN and CUDAHY,[*] Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

Plaintiff environmental organizations Catskill Mountains Chapter of Trout Unlimited, Inc., Theodore Gordon Flyfishers, Inc., Catskill–Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc., and Riverkeeper, Inc. (collectively "Catskill") appeal from an October 6, 2000 order of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., *Chief District Judge*) granting a motion to dismiss under Fed.R.Civ.P. 12(b)(6) made by defendants City of New York, New York City Department of Environmental Protection, and Joel A. Miele, Sr., Commissioner of the Department of Environmental Protection (collectively "New York City" or "the City"). We conclude that some of Catskill's claims should not have been dismissed and those that were properly dismissed should have been dismissed without prejudice. Accordingly, we reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

Since before World War II, New York City has operated Schoharie Dam and Reservoir in the Catskill Mountains, to provide drinking water for New York City. Water is diverted south from the Schoharie Reservoir ("the Reservoir") through the Shandaken Tunnel ("the Tunnel") for several miles and released into Esopus Creek ("the Creek"), which in turn empties into Ashokan Reservoir. The transfer of water from the Reservoir to Esopus Creek and Ashokan Reservoir facilitates its delivery to New York City for use as drinking water.

Absent the tunnel, water leaving the Reservoir would flow north in Schoharie Creek, join the Mohawk River, and flow into the Hudson River. Water from Esopus Creek, on the other hand, makes its way southeast to the Hudson by way of Ashokan Reservoir. Schoharie Reservoir and Esopus Creek are hydrologically connected only insofar as both are tributaries of the Hudson. Under natural conditions, water from the Schoharie Reservoir would never reach Esopus Creek.

Plaintiffs-appellants primarily represent recreational users of Esopus Creek. On November 20, 1998, Catskill sent a letter to the City, the United States Environmental Protection Agency ("EPA"), and the New York State Department of Conservation ("NYSDEC"), indicating Catskill's intention to file suit in district court under the federal Clean Water Act ("CWA," "the Act"), 33 U.S.C. § 1251 et seq. The Act permits aggrieved parties to bring civil actions to enforce certain of the statute's requirements against alleged violators. *See* 33 U.S.C. § 1365 ("Citizen suits").

On March 31, 2000, Catskill filed a complaint in district court alleging that the

[*] The Honorable Richard D. Cudahy of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

City, as owner and operator of the Schoharie Reservoir and Shandaken Tunnel, was in violation of 33 U.S.C. § 1311(a), which prohibits "the discharge of any pollutant" unless those discharges are conducted in accordance with a duly issued discharge permit. 33 U.S.C. § 1311(a) (citing permit requirement in 33 U.S.C. § 1342). Catskill alleged that the Tunnel discharges pollutants in the form of "suspended solids," "turbidity," and heat into Esopus Creek. They alleged that the suspended solids and turbidity are the result of earth-disturbing activities within the Reservoir's watershed that produce fine, red-clay sediments in the Reservoir. They further alleged that the discharges cause the Creek to violate state water quality standards for turbidity and temperature. Esopus Creek, Catskill contended, is naturally clearer and cooler than the water entering it from the Tunnel and supports "one of the premier trout fishing streams in the Catskill Region."

The City responded by moving under Fed.R.Civ.P. 12(b)(1) that the case be dismissed for want of jurisdiction because Catskill's notice-of-intent-to-sue letter ("NOI letter") was inadequate, and a proper NOI letter, they argued, is a jurisdictional prerequisite for a CWA citizen suit. The City also moved pursuant to Fed. R.Civ.P. 12(b)(6) that the case be dismissed because, although the City admits that it lacks a permit to discharge into Esopus Creek, it need not obtain one because its releases do not constitute "discharges" as defined by the CWA.

The district court denied the City's Rule 12(b)(1) motion, concluding that Catskill's NOI letter comported with the requirements of the Act and EPA regulations, but granted the Rule 12(b)(6) motion. It found that, as a matter of law, the Reservoir and Tunnel did not effect an "addition" of a pollutant to the Creek, as

required to trigger the CWA's permit requirement. See 33 U.S.C. § 1362(12) (defining "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source"). Catskill appealed.

## DISCUSSION

The City makes two arguments in support of the district court's dismissal. It first argues that the district court and this court lack subject matter jurisdiction over the case because Catskill's NOI letter, required by the CWA's citizen suit provision, was inadequate and that a proper NOI letter is a prerequisite to the court's subject-matter jurisdiction. Second, the City reiterates its successful argument in the district court, that the complaint failed to state a claim, because Shandaken Tunnel does not effect an "addition" of a pollutant, as required to constitute a "discharge" for which a permit must be sought.

We agree with the City that the NOI letter did not provide adequate notice of Catskill's eventual claim regarding thermal discharges, but find the letter adequate to notify the City of the balance of Catskill's claims. The district court should have dismissed the thermal discharge claims without prejudice, however, and we therefore vacate the judgment with respect to those claims and remand with direction to dismiss them without prejudice to refiling after submission of a conforming NOI letter and after the 60–day delay required by the CWA. We also conclude that the district court erred in dismissing Catskill's complaint on the theory that Shandaken Tunnel does not "discharge" pollutants into Esopus Creek. We therefore reverse the judgment on the remaining claims and remand the case for further proceedings.

## I. The Statutory Framework

We begin with an overview of the regulatory regime. The CWA's primary func-

tion is to regulate the discharge of pollutants into navigable waters. Although the Act contains the lofty ˙goal of eliminating water pollutant discharges altogether, *see* 33 U.S.C. § 1251(a)(1), the regulatory regime it creates requires principally that discharges be regulated by permit, not prohibited outright. The Act mandates that "the discharge of any pollutant by any person shall be unlawful," 33 U.S.C. § 1311(a), "[e]xcept as in compliance" with other provisions of the statute, one of which establishes a permitting program, the "National Pollutant Discharge Elimination System" ("NPDES"), 33 U.S.C. § 1342. Section 1342 in turn provides for the issuance of discharge permits ("NPDES permits") that allow the holder to discharge pollutants at levels below thresholds incorporated in the permit. 33 U.S.C. § 1342(a); *see also* 40 C.F.R. § 122.1 et seq. In New York, the NPDES program is administered by NYSDEC and referred to as the State Pollution Discharge Elimination System ("SPDES"). *See* 33 U.S.C. § 1342(b) (authorizing state implementation of the NPDES program); N.Y. Envtl. Conserv. Law §§ 17–0105(13), 17–0701.

In the instant case, Catskill alleges that the City has been violating the CWA's unpermitted discharge prohibition by discharging water containing pollutants from Shandaken Tunnel into Esopus Creek without first obtaining an NPDES permit. The Act defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act defines "pollutant," "navigable waters," and "point source," 33 U.S.C. § 1362(6), (7), and (14), but the crux of this appeal is the meaning of "addition," which the Act does not define.

In addition to providing for enforcement by state agencies and the EPA, the CWA allows private parties to enforce its mandates, including the prohibition of unpermitted discharges in § 1311(a), against alleged violators in so-called "citizen suits." *See* 33 U.S.C. § 1365(a)(1), (f). An aggrieved plaintiff may bring a civil action for specific relief, such as the imposition of particular compliance measures, or civil penalties payable to the treasury, *see* 33 U.S.C. § 1365(a), and may recover attorney's fees, *see* 33 U.S.C. § 1365(d). At least 60 days prior to filing, however, the prospective plaintiff must provide notice of its claims to the potential defendant, the EPA, and the state in which the violations allegedly occurred. *See* 33 U.S.C. § 1365(b)(1)(A). If a competent state or federal enforcement agency brings a civil enforcement action against the defendant prior to the citizen complaint's being filed, or an administrative enforcement proceeding prior to the plaintiff's NOI letter, the citizen suit is preempted and must be dismissed. *See* 33 U.S.C. §§ 1319(g)(6), 1365(b)(1)(B).

## II. Catskill's Notice of Intent to Sue

██ The City claims that Catskill's NOI letter was inadequate because, while it was provided in a timely fashion to the proper parties, the letter failed to give the City adequate notice of the claims that Catskill intended to bring. Catskill's complaint as filed alleged discharges of "a high level of turbidity," "suspended solids," and "elevated temperatures." Yet the NOI letter stated only that the City has discharged "pollutants in the form of Total Suspended Solids and Settleable Solids into the Esopus Creek." The City argues that by failing to provide notice of the claims of turbidity and thermal discharges ultimately alleged in the complaint, the NOI letter was fatally defective, requiring the suit to be dismissed. Although the district court did not rely on this theory in dismissing the complaint, we may affirm on a basis

not relied on by the district court. *See Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 584 (2d Cir.2000). We conclude that the NOI letter failed to notify the City of Catskill's thermal discharge claims, but that fact does not invalidate Catskill's complaint in its entirety. Accordingly, we hold that those claims were properly dismissed.

The CWA does not describe the content of the required notice, but directs that "[n]otice ... shall be given in such manner as the Administrator shall prescribe by regulation." 33 U.S.C. § 1365(b). The EPA has adopted such regulations, which mandate, *inter alia,* as follows:

> Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a). In the past, we have refused to "allow form to prevail over substance" in considering the content required of an NOI letter, and have looked instead to what the particular notice given may reasonably be expected to accomplish. *Dague v. City of Burlington,* 935 F.2d 1343, 1354 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

The City contends that the EPA regulations require a potential plaintiff to include in an NOI letter each separate pollutant that will be alleged in a subsequent complaint as the basis of a violation of the Act. At least one circuit has adopted such a rule. *See Pub. Interest Research Group v.* *Hercules,* 50 F.3d 1239, 1248 (3d Cir.1995). On this theory, for example, a plaintiff could not bring suit for discharges of mercury, lead, and copper if the NOI letter alleged violations based only on discharges of copper. In that case, the claims of copper violations would stand, but the claims based on mercury and lead discharges would need to be dismissed. We agree with the City that such a rule logically follows from the regulatory scheme and therefore adopt it.

 The EPA regulations require that an NOI letter "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, [and] the activity alleged to constitute a violation." 40 C.F.R. § 135.3(a). We believe that to be "sufficient," the information provided must include the pollutant alleged to be the basis of a violation subsequently alleged in the complaint.

 Because each discharge of a pollutant represents a distinct violation of the Act, *see* 33 U.S.C. § 1311(a) ("the discharge of any pollutant ... shall be unlawful"); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1138 n. 19 (11th Cir.1990), identification in an NOI letter of a pollutant allegedly discharged is essential to provide adequate notice of the alleged violation. Discharges of mercury and lead, for instance, could be distinct violations, each subject to penalties of up to $25,000 per day. *See* 33 U.S.C. §§ 1319(d), 1365(a). To provide adequate notice of each violation that will be targeted in the citizen suit, the NOI letter must differentiate pollutants from nonpollutants and one pollutant from another. The rationale for such a rule is most apparent in the context of a suit alleging discharges in excess of NPDES permit limitations, in which the defendant may be discharging some pollutants lawfully and others unlaw-

fully. To enable the defendant to identify each violation that will be alleged, then, the NOI letter must specify each pollutant unlawfully discharged that will be alleged in a subsequent complaint. The principle applies equally where, as here, the defendant has failed altogether to obtain a permit. To state a claim based on unpermitted discharges, the plaintiff must allege some pollutant that was discharged without a permit. It follows, then, that to the extent the plaintiff intends to prosecute multiple violations involving multiple pollutants, each pollutant that will be the basis of such a claim must be set forth in the NOI letter.

The policies underlying the NOI requirement are furthered by this rule. The notice and 60–day delay requirements allow a potential defendant to identify its own violations and bring itself into compliance voluntarily, thus making a costly lawsuit unnecessary. See *Hallstrom v. Tillamook County*, 493 U.S. 20, 29–30, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989); *Dague*, 935 F.2d at 1351; see also *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that if the defendant ceases its violations prior to the filing of the complaint, the action is barred). Specific knowledge of the pollutants allegedly discharged unlawfully makes it easier for the defendant to promptly rectify the problem. *Cf. Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819–20 (7th Cir.1997) ("In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit.... The key to notice is to give the accused company the opportunity to correct the problem.").

The notice and delay requirements are also designed to allow the enforcer of first resort, the EPA or the appropriate state agency, to bring its own enforcement action, see *Hallstrom*, 493 U.S. at 29, 110 S.Ct. 304, which would preempt the citizen lawsuit, see 33 U.S.C. § 1365(b)(1)(B). Inclusion of each pollutant forming the basis of an alleged violation better allows enforcement agencies to identify and prosecute a potential defendant's violations, giving effect to Congress's intention that citizen enforcers supplement, not supplant, public enforcement. See *id.* (citing *Gwaltney*, 484 U.S. at 60, 108 S.Ct. 376).

■ Accordingly, we hold that an NOI letter must identify with reasonable specificity each pollutant that the defendant is alleged to have discharged unlawfully. Failure to do so will justify a district court's dismissing claims based on pollutants not properly noticed.

■ Turning to the case at hand, we conclude that Catskill's NOI letter adequately notified the City of some but not all of the violations subsequently alleged in the complaint. The district court found, and Catskill argues on appeal, that inclusion of "suspended solids" and "settleable solids" was sufficient to notify the City of Catskill's claims of turbidity and thermal discharges, because of the logical and empirical associations between suspended solids on the one hand and turbidity and thermal discharges on the other. We agree with respect to Catskill's claims of turbidity discharges, but not with respect to thermal discharges.

Turbid water, by definition, is water carrying high levels of solids in suspension. The presence of elevated levels of suspended solids inevitably produces turbidity. "Turbid" is defined as "having the lees or sediment disturbed: thick or opaque with matter in suspension." *Webster's Third New International Dictionary* 2464 (1981). Water cannot be turbid without suspended solids, and some level of turbidity is inherent where suspended solids are present.

Because each logically depends on the other, notice of discharges of suspended solids is sufficient to notify of an eventual claim based on discharges of "turbidity."

■ On the other hand, the relationship between suspended solids and temperature is one of association, not identity. To be sure, increased turbidity often produces increased water temperature. Particles suspended in water absorb heat, raising the temperature of the water. But the presence of suspended solids does not inevitably raise water temperature. The effect of suspended solids on temperature depends on a third variable, radiant heat, usually in the form of sunlight. Increased turbidity in a cold, dark place may not affect the temperature of the water at all, or may do so only infinitesimally, because no source of radiant heat is present. As a result, unlike suspended solids and turbidity, there is no necessary relationship between suspended solids and increased temperature. The relationship is only one of frequent association under ordinary circumstances.

Accordingly, to be sufficient, the allegations in an NOI letter must suggest that these ordinary circumstances were also prevalent. Where alleged circumstances indicate that suspended solids and increased temperature are very likely to be associated, notice of suspended solids may be sufficient to notify a reasonable person of a thermal discharge claim. In the instant case, Catskill's NOI letter does not state that such circumstances were prevalent.

■ For the foregoing reasons, we hold that Catskill's claims of unpermitted thermal discharges were properly dismissed under Rule 12(b)(6). However, those claims should have been dismissed without prejudice. Thus we vacate so much of the judgment as dismissed Catskill's thermal discharge claims with preju-

dice and remand those claims with direction that they be dismissed without prejudice to refiling after full compliance with 33 U.S.C. § 1365(b)(1)(A).

III. Interbasin Transfer as a "Release" Under the CWA

As we have noted, the CWA prohibits, unless otherwise allowed by permit, "the discharge of any pollutant," 33 U.S.C. § 1311(a), which the Act defines to mean "any addition of any pollutant to navigable waters from any point source," 33 U.S.C. § 1362(12). The statute does not define "addition." The City argues that the release of water from Schoharie Reservoir into Esopus Creek is not an "addition," citing *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C.Cir.1982), and *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir.1988), both of which accorded substantial deference to the EPA's position that the CWA's discharge permit requirement does not apply to discharges from dams. Catskill counters that the *Gorsuch* and *Consumers Power* courts accorded unjustified deference to the EPA's interpretation of "addition," that the cases are distinguishable on their facts, and that the City's conduct here qualifies as an "addition" under the plain meaning of that word. We agree with Catskill and accordingly reverse the district court and remand for further proceedings on Catskill's remaining claims.

A. The EPA's Position and the Proper Standard of Deference

■ In several policy statements made in opinion letters and reports to Congress in the 1970s and 1980s, the EPA took the position that dam releases should not be considered "discharges" under the CWA and thus NPDES permits would not be

required for those releases.[1] *See Gorsuch,* 693 F.2d at 167–69. This position was never formalized in a notice-and-comment rulemaking or formal adjudication under the Administrative Procedure Act, 5 U.S.C. §§ 553, 554, although the EPA subsequently reiterated its position in the *Gorsuch* and *Consumers Power* cases, as a defendant and amicus curiae, respectively. *See Consumers Power,* 862 F.2d at 583; *Gorsuch,* 693 F.2d at 165. Both courts rested their decisions on the conclusion that the EPA position deserved substantial deference and was reasonable. Given subsequent Supreme Court decisions governing judicial deference to federal agencies' constructions of the statutes that they implement, we hold that the EPA position is due less deference than that accorded it by the *Gorsuch* and *Consumers Power* courts.

In 1982, in *Gorsuch,* the District of Columbia Circuit deferred to the EPA's position that dam releases were not "additions" under the CWA, which it upheld as a reasonable construction of the statute. The *Gorsuch* plaintiffs had sued the EPA under 33 U.S.C. § 1365(a)(2), seeking a declaration that the EPA had a nondiscretionary duty to require NPDES permits from dam operators. After an extensive exegesis of the CWA's statutory text, structure, and legislative history, the court concluded that the EPA could reasonably conclude that dam releases were not "additions." *See* 693 F.2d at 170–83. Notwithstanding the court's extensive investigation of legislative intent, it relied ultimately on deference to the agency:

[W]e emphasize the narrowness of our decision. It is not our function to decide whether EPA's interpretation ... is the best one or even whether it is more reasonable than the Wildlife Federation's interpretation. We hold merely that EPA's interpretation is reasonable, not inconsistent with congressional intent, and entitled to great deference; therefore, it must be upheld.

693 F.2d at 183. In 1988, the Sixth Circuit reached the same conclusion. *See Consumers Power,* 862 F.2d at 584–87.

If the EPA's position had been adopted in a rulemaking or other formal proceeding, deference of the sort applied by the *Gorsuch* and *Consumers Power* courts might be appropriate. Instead, the EPA's position is based on a series of informal policy statements made and consistent litigation positions taken by the EPA over the years, primarily in the 1970s and 1980s. Recent Supreme Court cases emphasize that such agency statements do not deserve broad deference of the sort accorded by the *Gorsuch* and *Consumers Power* courts.[2] *See United States v. Mead Corp.,* 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Christensen v. Harris County,* 529 U.S. 576, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). In *Christensen,* the Supreme Court held that "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."

---

1. The original documents in which the EPA staked out its position were not included in the filings before this court and were not published in the usual sources of administrative law, the *Code of Federal Regulations* and the *Federal Register.* We accordingly base our discussion of the EPA's position on that included in the District of Columbia Circuit's comprehensive opinion in *Gorsuch.*

2. *Consumers Power* expressly applied the standard of deference elaborated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See* 862 F.2d at 584–85. *Gorsuch,* which predated *Chevron,* applied essentially the same degree of deference. *See* 693 F.2d at 166–67.

529 U.S. at 587, 120 S.Ct. 1655. "Instead," the Court continued, "interpretations contained in formats such as opinion letters are 'entitled to respect' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Id.* (citation omitted). The Court consequently held that an opinion letter by the Department of Labor deserved only this form of limited deference in its interpretation of a provision of the Fair Labor Standards Act. *See id.*

Like the position taken by the Department of Labor in its opinion letter in *Christensen,* the EPA position on dam discharges has never been articulated in circumstances that would give it the "force of law." *Gorsuch* describes only a series of letters and several presentations for Congress in reports and testimony that outlined the EPA's position. *See Gorsuch,* 693 F.2d at 167–69. None of these sources come close to the sort of formal, binding articulation of an agency's views that would justify *Chevron* deference after *Christensen.* That the EPA later relied on its position in litigation does not alter our analysis; a position adopted in the course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public scrutiny that justify *Chevron* deference. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *Ball v. Memphis Bar–B–Q Co.,* 228 F.3d 360, 365 (4th Cir.2000); *S. Utah Wilderness Alliance v. Dabney,* 222 F.3d 819, 828 (10th Cir.2000).

■ However, as *Mead* and *Christensen* make clear, courts do not face a choice between *Chevron* deference and no deference at all. Administrative decisions not subject to *Chevron* deference may be entitled to a lesser degree of deference: the agency position should be followed to the extent persuasive. *See Mead,* 121 S.Ct. at 2175–76 (citing *Skidmore v. Swift & Co.,*

323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). For the reasons that follow, however, we do not find the EPA's position to be persuasive.

**B. Defining "Addition"**

■ The EPA's position, upheld by the *Gorsuch* and *Consumers Power* courts, is that for there to be an "addition," a "point source must *introduce* the pollutant into navigable water from the outside world." *Gorsuch,* 693 F.2d at 165. We agree with this view provided that "outside world" is construed as any place outside the particular water body to which pollutants are introduced. Given that understanding of "addition," the transfer of water containing pollutants from one body of water to another, distinct body of water is plainly an addition and thus a "discharge" that demands an NPDES permit.

Both *Gorsuch* and *Consumers Power* essentially involved the recirculation of water, without anything added "from the outside world." Such recirculation, they concluded, could not be an "addition." In *Gorsuch,* water was released from a reservoir through a dam to the stream below. Plaintiffs complained that such a release amounted to a regulated discharge under the Act, requiring a permit. The reservoir above the dam and the stream below, at least arguably, were sufficiently the "same" water that the release might not be considered an "addition"; nothing was introduced to the water that was not, in some sense, already there. *See* 693 F.2d at 174–75.

In *Consumers Power,* the defendant had withdrawn water from Lake Michigan, along with some surprised fish, for hydroelectric power generation. The water and fish were then returned to the Lake after passing through hydroelectric generators, which puréed some of the fish. The court found that returning the fish to the Lake,

albeit in a different form, was not an "addition" because the fish had already been there. *See* 862 F.2d at 586. Indeed, the court concluded that "[t]he water which passes through the [defendant's hydropower works] never loses its status as water of the United States." *Id.* at 589. The navigable water was recirculated, but nothing was added. The Sixth Circuit therefore also concluded that the releases from the defendant's hydropower works were not "introduced from the outside world." *See id.* at 586. Beyond *Consumers Power,* several cases from other circuits, despite having found "additions" to have occurred, in dicta reiterated the *Gorsuch* holding. *See, e.g., Comm. to Save Mokelumne River v. E. Bay Mun. Util. Dist.,* 13 F.3d 305, 308–09 (9th Cir.1993); *United States v. Law,* 979 F.2d 977, 979 (4th Cir.1992) ("Where 'pollutants' exist[ ] *in the waters of the United States* before contact with these facilities, the mere diversion in the flow of the waters [does] not constitute 'additions' of pollutants to the water.").

The *Gorsuch* and *Consumers Power* decisions comport with the plain meaning of "addition," assuming that the water from which the discharges came is the same as that to which they go.[3] If one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not "added" soup or anything else to the pot (beyond, perhaps, a *de minimis* quantity of airborne dust that fell into the ladle). In requiring a permit for such a "discharge," the EPA might as easily require a permit for Niagra Falls.

 The present case, however, strains past the breaking point the assumption of "sameness" made by the *Gorsuch* and *Consumers Power* courts. Here, water is artificially diverted from its natural course

and travels several miles from the Reservoir through Shandaken Tunnel to Esopus Creek, a body of water utterly unrelated in any relevant sense to the Schoharie Reservoir and its watershed. No one can reasonably argue that the water in the Reservoir and the Esopus are in any sense the "same," such that "addition" of one to the other is a logical impossibility. When the water and the suspended sediment therein passes from the Tunnel into the Creek, an "addition" of a "pollutant" from a "point source" has been made to a "navigable water," and the terms of the statute are satisfied.

In *Dague v. City of Burlington,* 935 F.2d 1343 (2d Cir.1991), we implicitly held the release of polluted water from one water body to a distinct, less-polluted water body to be an addition of pollutants to the latter. We concluded that a "discharge" had occurred where leachate from a landfill entered a pond and thereafter water from the pond, polluted with the leachate, flowed through a culvert into a surrounding marsh. We held that (1) the pond and marsh were different navigable waters; (2) the culvert was the relevant point source; and (3) the release of pond water through the culvert was a "discharge." We thus necessarily implied that the transfer of water from the pond to the marsh was an "addition." *Id.* at 1354–55. We also expressly rejected the defendant's argument that the water flowing from pond to marsh was not an "addition," noting that "[u]nder this argument, pollutants would be 'added' only when they are introduced into navigable waters for the first time." *Id.* at 1354.

The First Circuit reached a similar conclusion in *Dubois v. U.S. Dep't of Agricul-*

---

**3.** We need not and do not decide whether those courts were correct in accepting that the source and destination waters were identi-

cal and thus whether we would reach their conclusions if presented with the same facts.

*ture,* 102 F.3d 1273 (1st Cir.1996). In that case, a ski resort operator on Department of Agriculture property pumped water without a permit from a polluted river into a less-polluted pond to operate its snow-making equipment. The court held that the transfer of polluted water from one water body to a distinct water body constitutes an "addition" of pollutants to the destination water body. The court emphasized that the two bodies of water, for all relevant purposes, were distinct: although water naturally flowed from the pond into the river, water would never naturally flow from river to pond. That difference made the pumping an "addition." *See id.* at 1296–97. The court distinguished *Gorsuch* and *Consumers Power* as involving movement of water within the same water body. *See id.* at 1299.

■ The City also argues that "addition" draws meaning from its association with the phrase "from a point source." This view misunderstands the import of the term "point source," which does not necessarily refer to the place where the pollutant was created but rather refers only the proximate source from which the pollutant is directly introduced to the destination water body. A pipe from a factory draining effluent into a navigable water is a point source, but the factory itself is not. This is clear from the text of the Act, which defines "point source," in relevant part, as

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.

33 U.S.C. § 1362(14). Under most circumstances, a "pipe, ditch, channel, tunnel, [or] conduit" is unlikely to have created the pollutants that it releases, but rather transports them from their original source to the destination water body.

■ As a "tunnel," Shandaken Tunnel plainly qualifies as a point source. The tunnel itself need not have created the pollution; it is enough that it conveys the pollutants from their original source to the navigable water. *See United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 646 (2d Cir.1993). The City's proposed interpretation of "from a point source" is inconsistent with the CWA's definition of a point source.

Given the ordinary meaning of the CWA's text and our holding in *Dague,* we cannot accept the *Gorsuch* and *Consumers Power* courts' understanding of "addition," at least insofar as it implies acceptance of what the *Dubois* court called a "singular entity" theory of navigable waters, in which an addition to one water body is deemed an addition to all of the waters of the United States. *See Dubois,* 102 F.3d at 1296–97. We properly rejected that approach in *Dague.* Such a theory would mean that movement of water from one discrete water body to another would not be an addition even if it involved a transfer of water from a water body contaminated with myriad pollutants to a pristine water body containing few or no pollutants. Such an interpretation is inconsistent with the ordinary meaning of the word "addition."

Even if we were to conclude that the proper application of the statutory text to the present facts was sufficiently ambiguous to justify reliance on the legislative history of the statute, *see Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), that source of legislative intent would not help the City. The legislative history is silent on the meaning of "addition." *See Gorsuch,* 693 F.2d at 175. Instead, the City relies principally on

evidence from other provisions of the statute that Congress sought (1) to target industrial and municipal wastes specifically, *see Plaza Health Labs.*, 3 F.3d at 647, and (2) to leave the regulation of water supply—and therefore dam and reservoir operations—to the states, *see* 33 U.S.C. § 1251(g) ("It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated, or otherwise impaired by this [Act].").

Yet like many complex statutes (and the CWA is among the most complex), the CWA balances a welter of consistent and inconsistent goals. In contrast with the policies cited by the City, the CWA also expressly includes a broad and uncompromising policy of "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Artificially transferring water and pollutants between watersheds as the City has done here might well interfere with that integrity, as Catskill has alleged. Moreover, in the past we have applied the Act's proscriptions beyond industrial discharges. *See Concerned Area Residents for the Env't v. Southview Farm*, 34 F.3d 114 (2d Cir.1994) (involving discharges of agricultural waste).

■ In any event, none of the statute's broad purposes sways us from what we find to be the plain meaning of its text. *Cf. Plaza Health Labs.*, 3 F.3d at 647 ("The narrow questions posed by this case ... may not be resolved merely by simple reference to [the CWA's] admirable goal[s]."). Where a statute seeks to balance competing policies, congressional intent is not served by elevating one policy above the others, particularly where the balance struck in the text is sufficiently clear to point to an answer. We find that the textual requirements of the discharge prohibition in § 1311(a) and the definition

of "discharge of a pollutant" in § 1362(12) are met here.

## CONCLUSION

The judgment of the district court is hereby reversed in part, vacated in part, and the case is remanded. We vacate so much of the judgment as dismissed Catskill's thermal discharge claims and remand with direction that those claims be dismissed without prejudice to refiling after full compliance with 33 U.S.C. § 1365(b)(1)(A). The remainder of the judgment dismissing the complaint is reversed and remanded for further proceedings consistent with this opinion. Costs are awarded to appellants.