412 F.3d 71
 Marisol DE LA MOTA, Froebel Chungata, individually and on behalf of a class of all others similarly situated, and Oren Doron Plaintiffs-Appellants,
v.
THE UNITED STATES DEPARTMENT OF EDUCATION and Margaret Spellings, in her official capacity as United States Secretary of Education,* Defendants-Appellees,
New York Law School, Rutgers-The State University of New Jersey, Defendants.
 Docket No. 03-6257.
 United States Court of Appeals, Second Circuit.
 Argued: August 9, 2004.
 Decided: June 14, 2005.
 
 Glenn Greenwald, Greenwald Christoph, P.C., New York, NY, for Plaintiffs-Appellants Marisol De La Mota, Froebel Chungata, and Oren Doron.
 Jeannette A. Vargas, Assistant United States Attorney, for David N. Kelley, United States Attorney for the Southern District of New York (Sara L. Shudofsky, Assistant United States Attorney, of counsel), New York, NY, for Defendants-Appellees.
 Before: JACOBS, B.D. PARKER, and HALL Circuit Judges.
 B.D. PARKER, JR., Circuit Judge.
 
 
 1
 Marisol De La Mota, Froebel Chungata, and Oren Doron are public service attorneys employed by New York City's Administration for Children's Services ("ACS"). ACS defines its mission as "to ensure the safety and well-being of all the children of New York" and to employ "all available means to be certain that children do not live in danger of abuse and neglect." De La Mota and Chungata work in the Child Support Litigation Unit to secure financial support for children in low-income families primarily by litigating paternity and child support actions. Doron works in the Division of Legal Services where he prosecutes child abuse and neglect cases on behalf of low income children. Appellants believed that they had been improperly denied cancellation of their student Perkins Loans under a provision of the Higher Education Act ("HEA" or "the Act") of 1965, authorizing cancellation to borrowers "providing, or supervising the provision of, services to high-risk children who are from low-income communities and the families of such children." 20 U.S.C. § 1087ee(a)(2)(I). They sued under the Administrative Procedure Act, challenging the Department of Education's ("DOE") interpretation of eligibility requirements for cancellation of Perkins Loans. 5 U.S.C. § 701 et seq. They now appeal from a judgment of the United States District Court for the Southern District of New York (Preska, J.) dismissing their claims. See De La Mota v. U.S. Dept. of Educ., No. 02 Civ. 4276(LAP), 2003 WL 22038741 (S.D.N.Y. Aug.29, 2003). Because we conclude that the appellants were presumptively eligible for loan forgiveness under the Act, and that the deference the District Court afforded various DOE pronouncements about such eligibility was unwarranted, we reverse.
 
 BACKGROUND
 Regulatory Framework
 
 2
 Title IV of the HEA directs the Secretary of the Department of Education to implement various federal student financial aid programs. The Perkins Loan Program is one such program, designed to assist institutions of higher education in financing low-interest loans to financially needy students. See 20 U.S.C. §§ 1070 et seq. Congress delegated to the Secretary the authority to implement Perkins Loans, including the authority to promulgate regulations governing the program. See 20 U.S.C. §§ 1087aa(a), 1221e-3. The Secretary has promulgated regulations under this section. See 34 C.F.R. § 674.
 
 
 3
 Under the program, the DOE provides federal monies to participating institutions. 20 U.S.C. § 1087bb. The institution makes matching capital contributions and the funds are the source of loans to eligible students. Once the student graduates or leaves the school, the loan is to be repaid. The institution's fund is revolving and repaid loans are deposited into the fund and then supplemented by new federal and institutional funds. In other words, Perkins Loans are "campus-based": The schools independently determine eligibility, advance funds, collect payments and make decisions concerning loan forgiveness.
 
 
 4
 Low-interest Perkins Loans are intended to assist undergraduate and graduate students with exceptional financial need. Customarily, a student obtains Perkins Loans in concert with other financial aid devices such as Stafford Loans, Pell Grants, private loans, work study and scholarships. Perkins Loans are often a crucial element in financial aid packages. Under the program, undergraduates may borrow up to $4000 and graduate students may borrow up to $6000 per year. 20 U.S.C. § 1087dd(a)(2)(A).
 
 
 5
 In 1985, Congress reauthorized and amended the 1965 HEA, renaming one of the loan programs in honor of Carl D. Perkins, long-time Chairman of the House Education and Labor Committee. At the same time, Congress amended the statute to encourage graduates to work in various areas of public service, such as teaching and the Peace Corps. This encouragement took the form of partial or total Perkins Loan cancellation. See 20 U.S.C. § 1087ee. Subsequent amendments to the HEA further expanded the categories of public service that qualify for loan cancellation to include law enforcement, nursing and additional types of childcare.
 
 
 6
 The section of the statute pivotal to this appeal was added by a 1992 Amendment. See Pub.L. 102-325, § 465(a)(5), 106 Stat. 448 (July 23, 1992). It provides that "loans shall be canceled ... for service": "(I) as a full-time employee of a public or private nonprofit child or family service agency who is providing, or supervising the provision of, services to high-risk children who are from low-income communities and the families of such children." 20 U.S.C. § 1087ee(a)(2). The HEA defines "low-income communities" as "communities in which there is a high concentration of children eligible to be counted under Title I of the Elementary and Secondary Education Act of 1965." 20 U.S.C. § 1087ii(a). The HEA defines "high-risk children" as "individuals under the age of 21 who are low-income or at risk of abuse or neglect, have been abused or neglected, have serious emotional, mental, or behavioral disturbances, reside in placements outside their homes, or are involved in the juvenile justice system." Id. at § 1087ii(b). The HEA does not define the term "providing... services." As noted, in order to cancel Perkins Loans, a borrower applies to the lending school, which, rather than the DOE, bears the responsibility for determining the applicant's eligibility for loan cancellation. See 34 C.F.R. § 674.52(a).
 
 
 7
 Since the 1992 amendments, the DOE, through handbooks and advice via telephone and e-mail, has wrestled with determining and giving participating institutions guidance about eligibility for loan cancellation for child or family service. The extent to which we are required to defer to these efforts is the critical issue on this appeal.
 
 
 8
 In 1995, the DOE enacted a regulation purportedly implementing the child or family service cancellation provision. In doing so, the DOE did not add institutional gloss or agency wisdom but rather incorporated verbatim the statute, 20 U.S.C. § 1087ee(a)(2)(I), into its own regulation — 34 C.F.R § 674.56(b)(1). It provides:
 
 
 9
 An institution must cancel up to 100 percent of the outstanding balance on a borrower's Federal Perkins or NDSL made on or after July 23, 1992, for service as a full-time employee in a public or private nonprofit child or family service agency who is providing, or supervising the provision of, services to high-risk children who are from low-income communities and the families of these children.
 
 
 10
 34 C.F.R § 674.56(b)(1). In addition to the rule, each year the Federal Student Aid Office of the DOE issues a Student Financial Aid Handbook to participating institutions to assist them in responding to loan cancellation requests. The Handbooks introduced a new qualification for loan cancellation based on child or family service not found in the statute, requiring that the services be extended "only" to high-risk children:
 
 
 11
 To receive loan cancellation for being employed at a child or family services agency, a borrower must be providing services only to high-risk children who are from low-income communities. The borrower may also be providing services to adults, but these adults must be members of the families of the children for whom services are provided. The services provided to adults must be secondary to the services provided to the high-risk children. [DOE] has determined that an elementary or secondary school or a hospital is not an eligible employing agency.
 
 
 12
 DOE Student Financial Aid Handbook (2001-2002).
 
 
 13
 Along with these sources of assistance, participating institutions may obtain guidance on loan cancellation requests by contacting the Policy Development Division of the DOE's Office of Post-secondary Education. Also, a neutral, independent office of the DOE, the Federal Student Aid Ombudsman, acts as a DOE contact for borrowers and, on request, attempts to resolve disputes with lenders, although the Ombudsman lacks the power to reverse a determination by a lending institution. See FSA Ombudsman, available at http://ombudsman.ed.gov (last visited March 1, 2005). Based on their positions with ACS, each plaintiff applied for loan cancellation.
 
 De La Mota
 
 14
 De La Mota applied for loan cancellation in 2000 through three academic institutions: City University of New York ("CUNY") and Manhattanville College where she did her undergraduate work, and New York Law School ("NYLS"). In the ACS Child Support Litigation Unit, she litigates paternity actions and prosecutes child support cases. For two years her loans were forgiven, but in the third year, one school, NYLS, rejected her application and demanded back payment for the previous two years. CUNY and Manhattanville continued to forgive her loans.
 
 
 15
 The DOE advised NYLS not to cancel her loans, because the services she provided to children were neither "direct" nor "only to high-risk children." The word "only" originated in the Handbooks, not the HEA statute or the DOE regulation. The requirement of "direct" services is not contained in the HEA statute, the DOE regulation, or the Handbooks. Rather it first appeared in an April 12, 2001 informal e-mail from a DOE Program Specialist to NYLS: "The borrower must be providing services directly to the high-risk children. In this case, the borrower is providing services to the City of New York as an attorney, she is not providing services directly to high-risk children." Subsequently, a letter from a DOE Ombudsman to De La Mota defended and relied on the "directly" and "only" requirements of the Handbooks and e-mail. Upon advice from the Program Specialist that De La Mota's services and supervision of the provision of services were not "directly" nor "only" targeted to low-income, high-risk children, NYLS rejected her application, informing her that the DOE had determined that her position at ACS did not qualify for loan cancellation, reversed her previous cancellations, and directed her to make back payments. When De La Mota contacted the DOE Ombudsman to investigate, he defended the school's decision, citing the Program Specialist's e-mail, and reiterated that De La Mota provided services to New York City, not directly to children.
 
 Chungata
 
 16
 Chungata, also a NYLS graduate, applied for loan forgiveness in 2001 based on his ACS employment where he also litigates paternity actions and prosecutes child support cases. NYLS informed Chungata that the DOE deemed him ineligible for loan cancellation. This decision was based solely on the e-mail from the Program Specialist concerning De La Mota's application for loan cancellation.
 
 Doron
 
 17
 Doron prosecutes neglect and child abuse cases for ACS in Brooklyn Family Court. He also petitions the court to determine permanent placement for abused and neglected children. He applied for cancellation through Tulane and Rutgers, the two schools from which he had received Perkins Loans. His application for loan cancellation drew conflicting responses: Tulane approved his application and canceled his debt, but Rutgers rejected his application and referred him to the DOE. When Doron contacted the DOE, the same Program Specialist e-mailed him that he was ineligible for cancellation because "[he] represent[s] the City of New York ... [He does] not provide services directly and exclusively to high-risk children." The Program Specialist also explained, "The Department of Education does not make the determination of eligibility for Federal Perkins Loan Program cancellation benefits. This is the responsibility of the college or university...." Despite the DOE's expressed lack of authority, it nonetheless issued an after-the-fact endorsement of Rutgers' rejection of Doron, stating: "We concur with the decision of Rutgers University to deny [Doron's] request for a cancellation of [his] Federal Perkins Loan."
 
 District Court Proceedings
 
 18
 The Appellants then sought judicial review under the Administrative Procedure Act of the DOE's interpretation of § 1087ee(a)(2)(I) and the denial of loan cancellation benefits. See 5 U.S.C. § 701. They also named their respective law schools as defendants. The DOE moved for summary judgment, which the District Court granted.
 
 
 19
 The District Court concluded that the DOE, acting pursuant to statutory authority, had issued regulations governing the administration of the Perkins Loan Program, including its repayment provisions, and that the DOE was entitled to "some degree of deference" in its interpretation of its own regulations and eligibility determinations pursuant to 20 U.S.C. § 1087ee(a)(2)(I). De La Mota, 2003 WL 22038741, at *2. The District Court also noted that neither the HEA nor the DOE's regulations defined "providing, or supervising the provision of, services" but that, in various pronouncements, the DOE clarified "providing services" to include those serving "only," "exclusively" and "directly" low-income, at-risk children. Id. The Court held that "[g]iving even the minimal amount of deference due to DOE's interpretation of its Regulations, DOE's consistent requirement that services be both exclusive and direct is not plainly erroneous or inconsistent with the Regulations or the HEA." Id. at *3. Finally, the District Court determined that application of the policy to the ACS employees was not arbitrary or capricious because, as attorneys for the city, they did not provide services "directly" to high-risk children. See id. This appeal followed. We review a district court's grant of summary judgment de novo, drawing all factual inferences in favor of the non-moving party. Mario v. P & C Food Markets, Inc., 313 F.3d 758, 763 (2d Cir.2002); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir.1999).
 
 DISCUSSION
 I.
 
 20
 As an initial matter, we note that the Appellants appear comfortably to meet the statute's textual qualifications for loan forgiveness. They are "full-time employee[s] of a public ... nonprofit child or family service agency" who are "providing ... services to high-risk children who are from low-income communities and the families of such children." 20 U.S.C. § 1087ee(a)(2)(I). The legislative history makes clear that the statute was intended "to encourage qualified individuals to seek [such] employment." H.R. Rep. 102-447, at 66 (1992). Congress thought cancellation subsidies were necessary because, traditionally, child and family service work tended to be low-paying, and the subsidies would encourage qualified graduates to enter the field.
 
 II.
 
 21
 Notwithstanding the text of the statute and its intended purposes, the DOE recommended rejection of the applications for loan forgiveness by applying its interpretation of the statute as articulated through the two agency Handbooks in the record and a few ad hoc e-mails. Specifically, the DOE inserted "only" as a qualification in the 1996-1997 and 2001-2002 Handbooks ("providing services ONLY to high risk children") (emphasis in the 2001-2002 Handbook). On the basis of this qualification, the DOE recommended denial of loan forgiveness if an applicant performed any service, however sporadic or minimal, for anyone not at high-risk and not from a low-income community. Later, a DOE Program Specialist concluded and informally opined that loan cancellation was available only to applicants who provided services "directly" and "exclusively" to high-risk children and their families. This requirement effectively disqualified any public interest attorney litigating on behalf of poor, high-risk children; according to the DOE, an ACS attorney's client is New York City and an attorney provides services directly only to her client. First apparent in a Program Specialist's informal advice, the "directly" requirement took on a life of its own and was reflexively defended — and adopted after the fact — by the Ombudsman. Significantly, the DOE did not use its regulation, 34 C.F.R § 674.56(b)(1), to interpret the statute, 20 U.S.C. § 1087ee(a)(2)(I), as the regulation simply repeated the text of the statute verbatim, without the refinement or explication suggestive of any perceived ambiguity in the meaning of "providing services."
 
 
 22
 The DOE maintains that its interpretation is entitled to Chevron deference, which requires courts to defer to an agency's interpretation of an ambiguous statute unless the interpretation is "arbitrary, capricious, or manifestly contrary to the statute." Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Chevron deference, if applicable, is mandatory. In re New Times Sec. Serv., Inc., 371 F.3d 68, 80 (2d Cir.2004). As an alternative position, the DOE maintains that, if Chevron deference is inapplicable, then its handling of loan forgiveness is at least entitled to Skidmore "respect." See Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). Under Skidmore, we show an agency's interpretation respect, "depend[ing] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Id. at 140, 65 S.Ct. 161.
 
 
 23
 The District Court did not reach the question of the degree of deference owed, recognizing that both parties agreed the DOE's interpretation was entitled to "some weight." De La Mota, 2003 WL 22038741, at *2 n. 1. Nevertheless, the District Court deferentially reviewed the agency's conclusion, applying a "plainly erroneous" and "inconsistent with the regulation" standard. Id. at *4.
 
 
 24
 Chevron deference is clearly inapplicable to the DOE's interpretation of the term "providing services" to permit them to be provided "only," "directly" and "exclusively" to high-risk children. Under Chevron, 467 U.S. at 865, 104 S.Ct. 2778, courts accord deference to an interpretation of a statute adopted by the agency that has been charged by Congress with responsibility for administering the provision. This deference, according to the DOE, is required here because of the "presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." Smiley v. Citibank (South Dakota), N.A., 517 U.S. 735, 740-41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). These are necessary but hardly sufficient requirements for Chevron deference.
 
 
 25
 The Supreme Court gave further attention to this issue in United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). It observed that an agency lacks a "lawmaking pretense in mind" when it makes pronouncements not binding on third parties and not in a notice-and-comment fashion. Id. at 233, 121 S.Ct. 2164. Mead's framework has been understood to distinguish "between formal and informal procedures" and "between generality and particularity in administrative decision making," where the former in each category warrant Chevron deference, but the latter do not. David J. Barron & Elena Kagan, Chevron's Nondelegation Doctrine, 2001 Sup.Ct. Rev. 201, 204 (2001). Here the "directly" and "exclusively" qualifications did not emerge from any formal rule-making procedures. As far as we can determine, they are ad hoc, previously unwritten rules, supplied by a DOE staff employee when determining appellants' eligibility. The requirement of "only" serving high-risk children, which first surfaced in the Handbook, fares no better, as its provenance is equally informal. Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000), made clear that "interpretations contained in policy statements, agency manuals and enforcement guidelines, all of which lack the force of law — do not warrant Chevron style deference."
 
 
 26
 Appellants contend that although a Skidmore analysis is appropriate, we ought not defer to the DOE's various informal or ad hoc interpretations. The DOE urges deference under Skidmore, because when denying loan cancellation, it contends that it "bring[s] the benefit of specialized experience to bear." Mead, 533 U.S. at 235, 121 S.Ct. 2164. We disagree. The DOE's critical narrowing requirements — "exclusively" and "directly" — hardly rise to the level of an agency interpretation since, as we have seen, they were pronounced initially by a DOE staff member. By contrast, the official narrowing of the statute with the addition of the qualification "only" originated in two DOE Handbooks; therefore the weight we accord the DOE's interpretation of this statute is determined through Skidmore analysis. See Christensen, 529 U.S. at 587, 120 S.Ct. 1655; Schneider v. Feinberg, 345 F.3d 135, 142 (2d Cir.2003); Catskill Mountains Chapter of Trout Unlimited, Inc., v. City of New York, 273 F.3d 481, 490-91 (2d Cir.2001).
 
 III.
 
 27
 In contrast to Chevron deference, Skidmore respect may be available to informal agency interpretations, but the weight accorded to such interpretations depends on their "thoroughness," "validity," "consistency," and "power to persuade." Skidmore, 323 U.S. at 140, 65 S.Ct. 161.
 
 A. Thoroughness
 
 28
 The DOE's 1996-1997 and 2001-2002 Handbooks interpret the eligibility requirement as applicable to those "providing services only to high risk children." In application, the DOE Program Specialist did not rely solely on "only," but grafted on "exclusively" and "directly." These latter requirements are neither synonymous with "only" nor equivalent in their narrowing force. For us to find "thoroughness evident in its consideration," the DOE would have had, at minimum, to adhere in practice to its own Handbook language and meaning. Skidmore, 323 U.S. at 140, 65 S.Ct. 161.
 
 
 29
 Furthermore, thoroughness is impossible for an agency staff member to demonstrate when the staff member does not report to the Secretary, bears no law-making authority, and is unconstrained by political accountability. Thorough consideration requires a macro perspective that a staff member, acting alone, lacks. Cf. Chao v. Russell P. Le Frois Builder, Inc., 291 F.3d 219, 228 (2d Cir.2002) (in weighing whether to accord Skidmore deference to the Secretary of Labor or to the Occupational Safety and Health Commission, observing that "case law stresses the delicacy and importance of the Secretary's role, contrasting it with the more limited function assigned by Congress to the Commission."). We have shown deference to the opinions of agency officials who, though not an agency secretary or commissioner, hold substantial responsibility. For instance, we noted that "even relatively informal [Health Care Financing Administration] interpretations, such as letters from regional administrators, `warrant[ ] respectful consideration' due to the complexity of the statute and the considerable expertise of the administering agency." Cmty, Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir.2002) (quoting Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 479, 122 S.Ct. 962, 151 L.Ed.2d 935 (2002)). The more critical point here, of course, is the immateriality of one staff member's interpretation, when Congress expressly delegated rule-making authority to the Secretary. See 20 U.S.C. §§ 1087aa(a), 1221e-3. The DOE has not convinced us that its Program Specialist exhibits either this authority or expertise.
 
 
 30
 Moreover, it is insufficient for the DOE as an agency merely to adopt the staff member's interpretation after the fact, or during the course of subsequent litigation. "[A] position adopted in the course of litigation lacks the indicia of expertise, regularity, rigorous consideration, and public scrutiny that justify Chevron deference." Catskill Mountains, 273 F.3d at 491. Such endorsements also lack the thoroughness required for Skidmore respect.
 
 B. Validity
 
 31
 The "validity" element of Skidmore analysis draws our attention to whether an agency pronouncement is well-reasoned, substantiated, and logical. See Coke v. Long Island Care at Home, Ltd., 376 F.3d 118, 134 (2d Cir.2004) (finding an agency's interpretive regulation invalid under a Skidmore analysis because it offered "virtually no explanation" for inconsistent regulations and because it did not account for a sweeping shift in policy); Colaio v. Feinberg, 262 F.Supp.2d 273, 289 (S.D.N.Y.2003) (holding that a Special Master's policies merit Skidmore respect because, inter alia, the policies were supported by "evidence and valid reasoning").
 
 
 32
 The DOE contends that, in practice, it needs to narrow § 1087ee(a)(2)(I) in order to distinguish, for instance, between the support staff (administrative assistants, janitors, fundraisers) at a child or family service agency and those properly deserving loan cancellation. However, the addition of "only" does not help to reach this end.
 
 
 33
 The DOE requires "direct" provision of services. By "direct," the DOE apparently means interaction between the service provider and the child. However, the statute expressly covers those working on behalf of children indirectly: It covers employees "supervising the provision of [ ] services." 20 U.S.C. § 1087ee(a)(2)(I). It also covers those providing services to children and "the families of such children." Id.
 
 
 34
 The "directly" requirement, when interpreted to exclude public interest attorneys because the government is their "client," further erodes § 1087ee(a)(2)(I). All qualifying "full-time employee[s] of a public or private nonprofit child or family service agency" serve multiple beneficiaries — the children at risk, the community, the government, the employing agency, the donors and trustees of the employing agency, to name the most obvious. The mere fact that a public interest attorney represents a client does not necessarily make that client the exclusive beneficiary of their work.
 
 
 35
 The DOE also requires provision of services "exclusively" to high-risk and low-income children. The statute and regulation provide loan cancellation for those rendering "services to high-risk children who are from low-income communities." 20 U.S.C. § 1087ee(a)(2)(I); 34 C.F.R § 674.56(b)(1). The statute does not require that the children be low-income, but simply that they be from low-income communities. Congress has defined "low-income communities" for this purpose as "communities in which there is a high concentration of children eligible to be counted under title I of the Elementary and Secondary Education Act of 1965." 20 U.S.C. § 1087ii(a). In other words, the low-income requirement is by definition fluid, guided by concentration rather than fixed by rules.
 
 
 36
 The DOE representative who explained the rejection to De La Mota justified his understanding of the "exclusively" requirement as follows: "If even a small percentage of the children a borrower was providing services to did not meet that criteria, the borrower would not qualify for a child or family services cancellation." The requirement of utter exclusivity generates a result impossible to administer and at odds with Congress' goals in establishing the loan cancellation program.
 
 C. Power to Persuade
 
 37
 Perhaps most importantly, the DOE interpreted the statute in an advisory capacity. The DOE argued in its brief: "Plaintiffs, however, cannot impute to DOE the positions taken by CUNY Law School or Tulane University.... [A]s DOE has maintained throughout this litigation, it is the individual educational institutions that render decisions upon loan cancellation, not DOE." In proceedings below, the DOE conceded that it "does not make the determination of whether a borrower qualifies for a cancellation but upon request provides guidance to institutions that make the decisions." (emphasis added). We are especially disinclined to defer to an agency when it does not purport to speak authoritatively. In the past we have declined to show an agency deference when "there is no indication in the record of the process through which [the agency] arrived at its interpretation" and the agency itself "labels its interpretation as `tentative' "because "we cannot say with confidence that [the agency's] interpretation came about as the result of a reasoned process." Rabin v. Wilson-Coker, 362 F.3d 190, 198 (2d Cir.2004).
 
 
 38
 In sum, the DOE's interpretation — the addition of "only" in the Handbooks, coupled with the use of "directly" and "exclusively" in an advisory role — lacks the power to persuade, and the DOE fails to show thoroughness in its consideration or validity in its reasoning. Thus, even assuming arguendo that the agency offered consistent guidance, we are not bound to defer to its construction of the statute.
 
 IV.
 
 39
 20 U.S.C. § 1087ee(a)(2)(I) provides loan cancellation to anyone who, as "as a full-time employee of a public or private nonprofit child or family service agency ... is providing, or supervising the provision of, services to high-risk children who are from low-income communities and the families of such children." Congress expected that the indeterminate elements of this formulation would be clarified by regulation, but the Secretary has not provided such guidance. See 34 C.F.R. § 674.56(b)(1) (repeating statute's text verbatim). The resulting uncertainty impairs incentives for students to undertake careers aiding high-risk children and for educational institutions to train these students-schools must choose between financial risk and cheating their graduates. See 34 C.F.R. §§ 668.14(b)(25), 668.23(f), 668.23(g) (DOE can hold educational institution liable for erroneous grant of loan cancellation).
 
 
 40
 Because we find no basis for deference to the several ad hoc or unreasoned manuals and e-mails issued by DOE employees who lack authority to make policy, we are left for now with nothing but the statutory text and the apparent congressional intent to encourage qualified individuals to borrow the costs of preparing to serve children in poor communities. While we agree with the DOE that this evident purpose would be defeated unless the provided services target and reach at risk children predominately, a more restrictive reading of the statute is not compelled. Therefore, unless and until the DOE adopts such a reading in some form that commands deference or persuades, we will adhere to the only available analysis.
 
 
 41
 De La Mota, Chungata, and Doron are full-time employees of a public nonprofit child service agency. Through litigation, they provide services to neglected, abused, or unsupported children, who predominately are by definition the high-risk children targeted by the statute. De La Mota, Chungata, and Doron qualify for cancellation of their Perkins Loan obligations.
 
 CONCLUSION
 
 42
 We reverse the judgment of the District Court and remand for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Pursuant to Federal Rule of Appellate Procedure 43(c)(2), United States Secretary of Education Margaret Spellings is automatically substituted for former United States Secretary of Education Dr. Roderick R. Paige as a defendant-appellee in this case