PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

FRIENDS OF THE EARTH,
INCORPORATED; CITIZENS LOCAL
ENVIRONMENTAL ACTION NETWORK,
INCORPORATED,

            *Plaintiffs-Appellees,*

        v.

GASTON COPPER RECYCLING
CORPORATION,

            *Defendant-Appellant.*

No. 06-1714

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Matthew J. Perry, Jr., Senior District Judge.
(3:92-cv-02574-MJP)

Argued: September 22, 2010

Decided: January 5, 2011

Before TRAXLER, Chief Judge, and DAVIS and
KEENAN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Keenan wrote the opinion, in which Chief
Judge Traxler and Judge Davis joined.

---

**COUNSEL**

**ARGUED**: Jeffrey M. Gaba, GARDERE, WYNNE & SEWELL, LLP, Dallas, Texas, for Appellant. Kathleen L. Millian, TERRIS, PRAVLIK & MILLIAN, LLP, Washington, D.C., for Appellees. **ON BRIEF:** Stacy R. Obenhaus, GARDERE, WYNNE & SEWELL, LLP, Dallas, Texas, for Appellant. Bruce J. Terris, Carolyn Smith Pravlik, Aamra S. Ahmad, TERRIS, PRAVLIK & MILLIAN, LLP, Washington, D.C., for Appellees.

---

**OPINION**

KEENAN, Circuit Judge:

In this appeal, we consider whether Friends of the Earth, Inc. (FOE) and Citizens Local Environmental Action Network, Inc. (CLEAN), (collectively, the plaintiffs), maintained standing to prosecute a citizen suit asserting violations of the Clean Water Act, 33 U.S.C. §§ 1251-1387, against Gaston Copper Recycling Corporation (Gaston). Before the district court's entry of a final judgment order, William Shealy, a CLEAN member who had established standing on behalf of CLEAN, passed away. In 2008, we ordered a limited remand of this case for factual findings relating to whether the plaintiffs continued to maintain standing through other group members after Shealy's death. After reviewing these findings, we now conclude that the plaintiffs established standing to sue through FOE and CLEAN member Guy Jones.

We also consider in this appeal Gaston's argument challenging the district court's imposition of penalties. Gaston argues that the district court erred: 1) in imposing penalties against Gaston for violations not contained in the plaintiffs' pre-suit "notice letter" required by 33 U.S.C. § 1365(b); and 2) in imposing penalties against Gaston for violations alleg-

edly "wholly past," contrary to the requirement set forth in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987), that citizen suits brought under the Clean Water Act may only assert ongoing violations. We hold that the district court erred in imposing certain penalties against Gaston. We affirm in part and reverse in part the district court's judgment, and remand the case.

I.

A.

The Clean Water Act prohibits the discharge of any pollutant from a "point source" into navigable waters without a permit. 33 U.S.C. §§ 1311(a), 1319(c)(2)(A), 1362(7), 1362(12), 1362(14). The National Pollutant Discharge Elimination System (NPDES) authorizes the issuance of permits for the discharge of limited amounts of effluents.[1] 33 U.S.C. § 1342. Permit holders must comply with effluent limits and also must comply with various monitoring, testing, and reporting requirements. 33 U.S.C. § 1318. In South Carolina, the Department of Health and Environmental Control (DHEC) is authorized to issue NPDES permits. *See* S.C. Code Ann. § 48-1-100.

The Clean Water Act provides a mechanism for private citizen and public agency enforcement. The Act authorizes citizen suits, stating that "any citizen may commence a civil action on his own behalf" "against any person . . . who is alleged to be in violation of [ ] an effluent standard or limitation." 33 U.S.C. § 1365(a)(1). A violation of an "effluent stan-

---

[1]Although the Clean Water Act does not define "effluent," it does define "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

dard or limitation" includes a violation of any term or condition of an approved permit. 33 U.S.C. § 1365(f)(6). Remedies available in a citizen suit include an injunctive award and the imposition of civil penalties. 33 U.S.C. § 1365(a).

Under the Clean Water Act, no citizen suit "may be commenced" "prior to sixty days after the plaintiff has given notice of the alleged violation" to the Administrator of the Environmental Protection Agency (EPA), the state, in which the alleged violation occurred, and the alleged violator. 33 U.S.C. § 1365(b)(1)(A). Also, no citizen suit "may be commenced" if the EPA or the state has begun and is diligently prosecuting an action for a violation. 33 U.S.C. § 1365(b)(1)(B).

The notice required in citizen suits "shall be given in such manner as the Administrator [of the EPA] shall prescribe by regulation." 33 U.S.C. § 1365(b). The corresponding regulation states that the notice must include sufficient information to allow the recipient

> to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the persons or person responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).

## B.

The detailed facts of this case are set forth in two of our prior opinions. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 263 F. App'x 348 (4th Cir. 2008)(*Gaston II*); *Friends of the Earth, Inc. v. Gaston Copper Recycling*

*Corp.*, 204 F.3d 149 (4th Cir. 2000)(en banc)(*Gaston I*). We summarize those facts and the relevant procedural history below.

Gaston owns a metals smelting facility in Lexington County, South Carolina, which Gaston operated until 1995. After 1995, Gaston continued to treat contaminated storm water at the facility and to release this treated water into Lake Watson, which is located on Gaston's property. Lake Watson's water overflow discharges into Boggy Branch, a tributary of Bull Swamp Creek. The water in that creek flows into the North Fork of the Edisto River. The pollutants entering the waterway from Gaston's facility result from the contact of rainwater with scrap metal stored by Gaston on its property.

When Gaston purchased the facility in 1990, the prior owner had obtained a NPDES permit, which was reissued to Gaston and was effective through March 1, 1991. Gaston was issued a new permit (1991 permit), which contained two phases of effluent limits. The Phase I limits were effective beginning March 1, 1991, and the Phase II limits initially were effective from June 1, 1992 until the permit expired.

The Phase I limits in the 1991 permit were substantially the same as those contained in the previous permit. Those limits applied to numerous specified pollutants. The Phase II limits imposed more severe restrictions for specified pollutants.

The 1991 permit contained monitoring and reporting requirements, and included a three-part schedule of compliance for Gaston to meet its Phase II effluent limits. This schedule required that Gaston: 1) submit a preliminary engineering report by March 31, 1991; 2) submit final plans and specifications by September 1, 1991 for any upgrade to its wastewater treatment plant necessary to comply with the Phase II discharge limits; and 3) begin complying with the Phase II limits on June 1, 1992.

Gaston failed to meet the September 1, 1991 deadline for submitting final plans for the necessary plant upgrade, and requested an extension until November 15, 1991. On September 17, 1991, DHEC, relying on Gaston's representation that the extension would not affect the compliance date of June 1, 1992 for Phase II limits, modified Gaston's permit by granting the extension until November 15, 1991. In October 1991, Gaston requested another extension, and DHEC granted an extension until December 15, 1991, but did not modify Gaston's permit. On December 23, 1991, Gaston submitted plans detailing its intended improvements to the treatment plant.

In March 1992 and again in April 1992, Gaston requested an extension of the June 1, 1992 deadline for complying with the Phase II effluent limits. On June 15, 1992, DHEC issued a public notice discussing Gaston's proposal to extend that deadline until March 14, 1993. On March 13, 1993, DHEC modified Gaston's permit to require that Gaston comply with the Phase II limits by April 2, 1993. In mid-July 1992, Gaston began construction on the upgrade of its wastewater treatment plant.

On July 13, 1992, the plaintiffs sent Gaston a letter (the notice letter), as required by 33 U.S.C. § 1365(b), asserting that Gaston had violated and continued to violate its permit requirements "in at least the instances set forth in [an] attached chronological list of permit violations." The attached list identified eight violations of effluent limitations for flow, mercury, and polychlorinated biphenyls (PCBs), between July 1990 and September 1991.

The plaintiffs also asserted in the notice letter that "there appear to be instances in which the facility has failed to comply with the monitoring and reporting requirements of the permit. However, the extent of these violations cannot be determined from the information available." The letter also contained the plaintiffs' allegation that Gaston failed to meet the requirements of the schedule of compliance when Gaston

did not submit its final plans and specifications by September 1, 1991.

The plaintiffs further asserted that based on reports from January 1991 through April 1992, Gaston's facility "is not in compliance with the Phase II limits [in effect as of June 1, 1992] because (1) the facility's discharges have consistently exceeded the Phase II limits and (2) the facility has not yet implemented remedial measures which would lower the pollution levels." Therefore, the plaintiffs asserted, in "June 1992, the facility will have violated its permit limits at least as to pH, copper, PCBs, and mercury."

The plaintiffs also stated in the notice letter that the "facility's history of noncompliance" indicated "a strong possibility that the facility will not comply" with any potentially revised schedule of compliance. Thus, the plaintiffs stated that they intended to file a citizen suit under the Clean Water Act to ensure Gaston's compliance with the conditions of its permit.

On September 14, 1992, the plaintiffs filed their complaint in the district court. In the complaint, the plaintiffs alleged that Gaston had discharged pollutants into a waterway in violation of its permit by failing to comply with discharge limits, failing to monitor and report its discharge properly, and failing to adhere to its compliance schedule. The plaintiffs also appended their notice letter to the complaint. The plaintiffs sought declaratory and injunctive relief, as well as civil penalties and costs. In its answer, Gaston asserted several arguments, including that the plaintiffs lacked standing to bring the action.

After discovery was completed, the plaintiffs filed a motion for summary judgment. In that motion, the plaintiffs asserted that Gaston committed 349 pollutant discharge violations, 239 monitoring violations, 493 reporting violations, 54 days of violation for failing to timely submit final improvement plans in accordance with the schedule of compliance, and 334 viola-

tions of the schedule of compliance date for meeting the Phase II limits. Gaston opposed the motion for summary judgment on numerous grounds but did not raise an objection to the sufficiency of the plaintiffs' notice letter.

Although the record does not indicate that the district court ruled directly on the plaintiffs' motion for summary judgment, the case proceeded to a bench trial in July 1995. During this trial, the district court received evidence and heard argument regarding Gaston's alleged violations of its permit requirements. Gaston did not raise any objection during trial regarding the adequacy of the plaintiff's notice letter.

Over two years later, but before the district court entered its judgment, the district court permitted the parties to file supplemental findings of fact. On August 27, 1997, Gaston filed a "supplemental proposed findings of fact and conclusions of law," asserting for the first time that the district court lacked authority to assess penalties for permit violations not alleged in the plaintiffs' notice letter.

In May 1998, the district court entered judgment dismissing the complaint on the ground that the plaintiffs failed to establish standing to bring the suit. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 9 F. Supp. 2d 589, 601 (D.S.C. 1998). The plaintiffs appealed to this court.

On appeal, Gaston argued that the plaintiffs lacked standing because they failed to establish "environmental degradation" to the waterway and, therefore, had not demonstrated an injury in fact. A divided panel of this court agreed with Gaston and affirmed the district court's judgment. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 179 F.3d 107 (4th Cir. 1999)(vacated). We granted rehearing en banc, vacated the panel's decision, reversed the district court's judgment, and remanded the case. *Gaston I*, 204 F.3d at 155-64.

On remand, the district court determined that Gaston violated its Phase I and Phase II effluent limitations for a period of 91 days. The district court concluded that Gaston violated Phase I discharge limits for levels of pH, cadmium, zinc, and iron. The district court also concluded that Gaston violated Phase II discharge limits for pH, cadmium, zinc, iron, copper, and oil and grease. Because DHEC had delayed the effective date of the Phase II effluent limitations, the district court held that Gaston was not required to comply with those stricter limits until April 2, 1993, and, therefore, was not liable for any Phase II violations prior to that date.

The district court found that Gaston had committed 396 monitoring violations, which included monitoring frequency violations, failure to complete required tests and periodic sampling, "holding time violations," and other methodological violations. The district court also found that Gaston committed 323 reporting violations, which included the failure to report exceeded Phase I limits for pH and Phase II limits for zinc, and failure to report monitoring violations. The district court further found that Gaston violated its schedule of compliance for 54 days.

On July 21, 2003, the district court entered judgment imposing a civil penalty of $2,340,000, and ordering Gaston to pay the plaintiffs' attorneys' fees and costs. The district court declined to include a penalty enhancement requested by the plaintiffs, because the court found that Gaston had made a good faith effort to comply with the permit requirements and did not enjoy an economic benefit based on its noncompliance.

After the district court entered judgment, Gaston moved to amend the judgment asserting that the court erred in imposing penalties for "matters not covered by the notice letter." The plaintiffs opposed this motion and asserted that Gaston had forfeited any argument regarding the adequacy of the notice

letter by failing to raise the argument until two years after the trial had concluded.

The plaintiffs also moved to amend the judgment to reflect that Shealy had died prior to the judgment date, asserting that they continued to maintain standing through members Guy Jones and William McCullough, Jr. Gaston opposed the plaintiffs' motion and argued that the plaintiffs no longer had standing to prosecute the case.

In September 2005, the district court granted the plaintiffs' motion to amend the judgment to reflect that Shealy had died, and held that the plaintiffs had maintained standing through Jones and McCullough. In May 2006, the district court entered a final order, denying Gaston's motions challenging the plaintiffs' demonstration of standing and the amount of the civil penalty. The district court modified one portion of its findings of fact by reducing the number of reporting violations from 323 to 317.

Gaston filed an appeal to this court asserting several arguments. Gaston contended that the district court did not have jurisdiction to enter its final judgment because the plaintiffs did not satisfy the constitutional requirements for standing after Shealy died. Gaston also asserted that the district court erred in imposing penalties for violations not identified in the notice letter and for violations that were not ongoing at the time the complaint was filed.

After considering the parties' arguments, we entered an unpublished per curiam opinion ordering a limited remand. *Gaston II*, 263 F. App'x at 356. We ordered the remand because the record was insufficient to determine whether the plaintiffs had maintained standing through Jones or McCullough. *Id.*

On remand, the district court made additional factual findings and concluded that the plaintiffs established standing

based on Jones' membership in FOE and CLEAN and his use of the affected waters. We now consider the merits of Gaston's appeal to this court.

## II.

We first address Gaston's argument that the plaintiffs have failed to establish standing through their member, Jones. To inform our discussion, we recite a brief summary of this court's previous consideration of the plaintiffs' standing and the district court's most recent factual findings.

## A.

In the district court's initial holding in 1998 dismissing the plaintiffs' complaint, the court held that the plaintiffs failed to demonstrate the requisite injury to establish standing. *Gaston Copper Recycling Corp.*, 9 F. Supp. 2d at 601. The district court concluded that the plaintiffs did not present evidence concerning the chemical content of the waterways affected by the facility's pollutants, an increase in the salinity of the waterways, or other negative change to the ecosystem of the water. *Id.* at 601.

In *Gaston I*, we explained that under the recently-released opinion in *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000), a plaintiff is not required to show environmental harm to establish an injury in fact. *Gaston I*, 204 F.3d at 160-61. We concluded that CLEAN member Shealy established an injury in fact by asserting a reasonable fear and concern about the effects of the facility's discharge on his use and enjoyment of his lake, which is located four miles downstream of Gaston's facility. *Id.*

Also in *Gaston I*, we explained that the record demonstrated that the discharges from Gaston's facility affected or could affect the water "a significant distance downstream" of the facility. *Id.* at 158. We cited as "objective evidence," a

written response by a DHEC official to a property owner's question raised during the comment period for Gaston's permit, in which the official stated:

> the runoff will go to Boggy Branch to Bull Swamp to the Edisto River. The confluence of Bull Swamp and [the] Edisto River is 16.5 miles [from the Gaston facility].

*Id.* at 158, 162.

We concluded that "the clear implication of DHEC's response is that [the facility's] discharges can impact the receiving waterway for a good distance downstream – well past Shealy's property and on down to the Edisto River itself." *Id.* at 158. We stated that the discharge "affects or has the potential to affect the waterway for 16.5 miles downstream" from Gaston's facility. *Id.* We also observed that Shealy's lake was more than four times closer to the facility than "the acknowledged outer perimeter of the discharge zone." *Id.* Thus, we concluded that the district court improperly required the plaintiffs to demonstrate that "the chemical content of the waterway was affected" by the facility, or that there was "other negative change in the ecosystem of the water." *Id.* at 159.

After the district court entered judgment on the merits against Gaston and after Shealy's death, we considered in *Gaston II* whether the plaintiffs continued to have standing through Jones or McCullough. *Gaston II*, 263 F. App'x at 353. In *Gaston II*, we reiterated that the plaintiffs were not required to present evidence of actual harm to the environment so long as a direct nexus existed between the plaintiffs and the "area of environmental impairment." *Id.* (quoting *Gaston I*, 204 F.3d at 159). We concluded, however, that the plaintiffs were required to show that their members Jones or McCullough used the area affected by the challenged activity, and that use of "an area roughly in the vicinity" of the affected

area was insufficient. *Id.* at 355 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565-66 (1992)).

In describing the affected area, we noted that in *Gaston I*, we described the "confluence" of Bull Swamp Creek and the North Fork of the Edisto River as the "outer perimeter of the discharge zone" acknowledged by DHEC. *Id.* at 356 (quoting *Gaston I*, 204 F.3d at 158). However, in *Gaston II*, we explained that this outer perimeter was not necessarily the far-thest point that the runoff reached. *Id.* We concluded that we were unable to determine whether Jones or McCullough

> had the requisite connection to the waters in the affected area without knowing either that they used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork, or knowing how much farther beyond the confluence that the runoff pro-ceeded and where, in relation to this point, the waters that Jones and McCullough used and planned to use were.

*Id.* We therefore ordered a "limited remand" for the district court to resolve those specific factual issues. *Id.*

On remand in the district court, the plaintiffs filed a motion for summary judgment, asserting that Jones used the water in the area of the confluence and the affected water farther downstream from the confluence. The plaintiffs filed several affidavits from Jones describing his use of the waterways.

After considering the parties' pleadings and conducting a hearing, the district court made numerous factual findings, which included the following determinations. Since 1983, Jones has been the president of River Runner Outdoor Center (River Runner), a company that provides guided canoe and kayak trips on the Edisto River and elsewhere. Jones has guided trips on a route that begins upstream of the confluence and continues through the waters at the confluence and farther

downstream. In recent years, River Runner has decreased the number of trips it takes near the confluence, in part because of concern that runoff from the Gaston facility is polluting the area waters.

The district court also found that a substantial portion of certain pollutants discharged by Gaston's facility reaches the confluence and travels the Edisto River at least 105 miles downstream of the confluence. Jones has made many canoe or kayak trips on the Edisto River within 105 miles downstream of the confluence.

B.

In this factual context, we now consider Gaston's argument that the district court erred in holding that the plaintiffs established standing through their member, Jones. We observe that Gaston does not dispute the district court's findings of fact made pursuant to our limited remand. Instead, Gaston argues that the plaintiffs failed to prove an injury in fact necessary to establish standing because they failed to show that Jones used an area of the water affected by the discharge. In particular, Gaston asserts that the plaintiffs did not show that the water at the confluence of Bull Swamp Creek and the North Fork of the Edisto River is affected by the facility's discharge.

In response, the plaintiffs contend that they established standing based on the district court's factual finding that Jones used the water at the confluence of Bull Swamp Creek and the North Fork of the Edisto River. According to the plaintiffs, this court previously determined that the water at the confluence was impacted by the discharge from Gaston's facility. We agree with the plaintiff's arguments.

Article III of the Constitution restricts federal courts to the adjudication of cases and controversies. The requirement of standing is "perhaps the most important" condition of justiciability. *Gaston I*, 204 F.3d at 153 (quoting *Allen v. Wright*, 468

U.S. 737, 750 (1984)). This requirement ensures that a plaintiff has a personal stake in the outcome of a dispute, and that judicial resolution of the dispute is appropriate. *Emery v. Roanoke City Sch. Bd.*, 432 F.3d 294, 298 (4th Cir. 2005).

To meet the constitutional requirement for standing, a plaintiff must prove that: 1) he or she suffered an "injury in fact" that is concrete and particularized, and is actual or imminent; 2) the injury is fairly traceable to the challenged action of the defendant; and 3) the injury likely will be redressed by a favorable decision. *Gaston I*, 204 F.3d at 154 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). As we explained in *Gaston I*, in addition to the above constitutional standing requirements, an individual also must satisfy any applicable statutory requirements for standing. *Id.* at 155.

The Clean Water Act confers standing on any "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(a), (g). If a plaintiff asserting an interest under the Clean Water Act meets the constitutional standing requirements to satisfy Article III, then that plaintiff satisfies the statutory threshold as well. *Gaston I*, 204 F.3d at 155.

An organization may have standing to sue based on an injury to the organization itself or as a representative of its harmed members. *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). To have representational standing, as asserted by the plaintiffs in this case, an organization must show that one of its members would have standing to sue in his or her own right. *Id.* (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

In this case, Gaston challenges only the plaintiffs' ability to establish an injury in fact through their member, Jones. Therefore, we will focus our analysis on this aspect of the standing inquiry.

Injury in fact is alleged adequately by "environmental plaintiffs" when they "aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw* 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). However, a plaintiff "claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it." *Lujan*, 504 U.S. at 565-66 (citation omitted).

We determined in *Gaston I* that the objective evidence showed that discharges from Gaston's facility impacted the waterway "on down to the Edisto River itself," including the confluence of Bull Swamp Creek and the North Fork of the Edisto River (the confluence), 16.5 miles from the Gaston facility's discharge point. *See Gaston I*, 204 F.3d at 158. In *Gaston II*, we explained that we were unable to determine whether Jones had the requisite connection to the affected waterway because the record showed only that Jones used the water "downstream" of Bull Swamp Creek and of the confluence. *Gaston II*, 263 F. App'x at 356. We particularly noted that the record did not show whether Jones used the waters at the confluence. *Id.* at 355-56.

On remand, the district court found that Jones and other River Runner employees have conducted canoe and kayak trips on a route beginning slightly upstream of the confluence, continuing through the waters at the confluence, and then farther downstream. The district court found that Jones began using the waters at the confluence for canoeing and kayaking in the 1980s, and continued to use those waters throughout the next two decades. The district court also found that River Runner has decreased the number of trips it takes near the confluence, in part because of concern that runoff from Gaston's facility is polluting the waters in that area.

We hold that these uncontested factual findings establish Jones' direct connection to the use of the waters slightly

upstream of the confluence on Bull Swamp Creek, and through the waters of the confluence where Bull Swamp Creek enters the North Fork of the Edisto River. Based on our determination in *Gaston I* that these waters were impacted by the discharges from Gaston's facility, we are now able to conclude that Jones used "area affected by the challenged activity" rather than "an area roughly in the vicinity of it." *See Lujan*, 504 U.S. at 565-66. In view of Jones' use of the waters in this area, and his reasonable concern that runoff from Gaston's facility is polluting the waters in that area, we hold that the plaintiffs asserted an injury in fact through their member Jones and established standing to prosecute this suit.

III.

We next consider Gaston's argument that the district court erred in imposing penalties for violations of the Clean Water Act not identified in the plaintiffs' notice letter. Gaston asserts that the notice letter did not allege violations of the Phase I limits for pH, cadmium, zinc, and iron. Gaston also contends that because it ultimately received an extension of time until April 1993 to comply with the Phase II limitations, the plaintiffs could not have provided notice of Phase II violations at the time they sent their notice letter in July 1992.

Additionally, Gaston asserts that the allegations in the notice letter relating to violations of monitoring and reporting requirements were inadequate, because those allegations did not refer to the specific permit condition violated or to the dates of those violations. Based on these various omissions, Gaston contends that the plaintiffs' notice letter did not include sufficient information to permit Gaston to identify the specific standard, limitation, or order violated, as required by 40 C.F.R. § 135.3(a). Therefore, according to Gaston, the district court lacked jurisdiction or otherwise erred in imposing penalties based on the court's finding of those violations.

In response, the plaintiffs assert that Gaston's argument, which essentially presents a legal defense, is not a true chal-

lenge to the district court's subject matter jurisdiction. The plaintiffs argue that, therefore, Gaston forfeited its right to raise this argument, because Gaston waited until two years after the district court heard the evidence in this case to raise the matter before the district court.

Alternatively, the plaintiffs argue that they provided adequate notice to Gaston based on the information available at the time they sent the notice letter in July 1992. Regarding the Phase I limits, the plaintiffs assert that the notice letter informed Gaston of a likely violation of "at least" mercury, flow, and PCBs. The plaintiffs contend that because Gaston had failed to report pH violations and because Gaston's violations for cadmium, zinc, and iron occurred after the plaintiffs filed their complaint, the plaintiffs were unable to include these violations in the notice letter.

In addition, the plaintiffs assert that they sufficiently addressed Gaston's Phase II limit violations in the notice letter by stating that the facility consistently had exceeded those limits and had not yet implemented remedial measures to lower these pollution levels. Therefore, in their notice letter, the plaintiffs concluded that in June 1992, Gaston will have violated its limits "at least" as to pH, copper, PCBs, and mercury.

Finally, the plaintiffs assert that because Gaston's monitoring and reporting data were unavailable to the plaintiffs when they sent the notice letter, the plaintiffs' general allegation that Gaston failed to comply with the monitoring and reporting requirements of the permit was sufficient. The plaintiffs contend that they were not required to wait until additional information became available, or until Gaston committed additional violations of its permit, to give notice and file suit under the Clean Water Act.

In considering the parties' arguments, we are presented with several issues, including the alleged mandatory nature of

the Clean Water Act's notice requirement, the information that notices given under the Act must contain, and the timing of Gaston's challenge to the plaintiffs' notice. We begin our analysis by examining the plain language of the Clean Water Act that a citizen suit may not "be commenced" before 60 days after the plaintiff has given notice of the alleged violation to the EPA, to the state in which the violation occurred, and to the alleged violator. 33 U.S.C. § 1365(b)(1)(A).

We note that the Supreme Court, in *Hallstrom v. Tillamook County*, 493 U.S. 20 (1989), considered an identical statutory notice requirement found in the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(b)(1). The Supreme Court held that the plain language of that RCRA provision created a mandatory condition precedent to the commencement of a citizen suit under the RCRA. *Hallstrom*, 493 U.S. at 31.

In *Hallstrom*, the defendants asserted before trial that the district court lacked jurisdiction to hear the case because the plaintiff failed to provide the required statutory notice to the EPA and to the state of Oregon. *Id.* at 24. The Supreme Court declined to decide whether the notice provision in the RCRA was a jurisdictional or a procedural requirement, but concluded that a district court may not disregard the notice requirements at its discretion and ordered that the case be dismissed. *Id.* at 31.

In addressing the RCRA statutory notice requirement, the Supreme Court emphasized that maintaining strict compliance with such requirements serves Congress' goals in permitting citizen suits for the enforcement of environmental regulations. *Id.* at 29. By authorizing such citizen suits, Congress sought to balance the benefit of encouraging citizen enforcement of environmental regulations against the problems encountered when excessive numbers of citizen suits are filed in the federal courts. *Id.*

The Supreme Court further observed that statutory notice and delay provisions like the ones found in the RCRA serve two other important legislative objectives. *Id.* These provisions allow governmental agencies to take responsibility for the enforcement of environmental laws and regulations, eliminating the need for multiple citizen suits. *Id.* The notice and delay requirements also provide an alleged violator the opportunity to attempt compliance with its permit restrictions, thereby avoiding litigation based on the alleged violations. *Id.*; *see Gwaltney*, 484 U.S. at 60.

These legislative objectives cannot be met, however, if citizen plaintiffs are excused from providing adequate information in their pre-suit notice to enable the recipients of such notices to identify the specific alleged violations. Thus, the Supreme Court held in *Hallstrom* that the notice and delay requirements of the RCRA are "mandatory conditions precedent to commencing suit" under that statutory scheme. 493 U.S. at 31.

Applying this same reasoning, we conclude that compliance with the notice and delay provisions of § 1365(b)(1)(A) of the Clean Water Act is a mandatory condition precedent to the commencement of a suit under this Act. This statute explicitly requires that "[n]otice under this subsection shall be given in such manner as the Administrator [of the EPA] shall prescribe by regulation." 33 U.S.C. § 1365(b). Thus, to ensure evenhanded application of the Clean Water Act, we further conclude that compliance with the requirements of 40 C.F.R. § 135.3(a) is a mandatory condition precedent to filing suit under the Act. *See Hallstrom*, 493 U.S. at 31.

We observe that our conclusion is in accord with a decision of the Second Circuit concerning the required content of a notice letter for citizen suits brought under the Clean Water Act. In *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 487-88 (2d Cir. 2001), the court held that the notice letter must inform the alleged viola-

tor of each violation that will be targeted in the citizen suit, and must differentiate one pollutant from another.

Although the notice requirements for citizen suits brought under the Clean Water Act are strict and specific, we nevertheless agree with the cautionary reasoning of other circuits warning against an overly technical application of regulatory requirements. As these other decisions have emphasized, the requirement of adequate notice does not mandate that citizen plaintiffs "list every specific aspect or detail of every alleged violation." *Pub. Interest Research Group of N.J., Inc. v. Hercules, Inc.*, 50 F.3d 1239, 1248 (3d Cir. 1995); *accord Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.*, 375 F.3d 913, 917 (9th Cir. 2004).

Based on our holding that compliance with 40 C.F.R. § 135.3(a) is a mandatory condition precedent to filing suit under the Clean Water Act, the issue of the sufficiency of the plaintiffs' notice letter, at its core, presents a legal defense to the plaintiffs' claim. However, before we examine the merits of Gaston's challenge, we first must decide whether Gaston timely asserted this defense in the district court.

Although Gaston presented this defense about two years after the evidence was heard by the district court, the determinative consideration nonetheless is whether Gaston raised its defense before the trial was concluded in the district court. Under Rule 12(h)(2), a legal defense challenging a claim may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment on the pleadings under Rule 12(c), or "at trial." Fed. R. Civ. P. 12(h)(2). Given the procedural posture of this case, the only applicable issue under Rule 12(h)(2) is whether Gaston raised its defense "at trial."

This term is not ambiguous. In the context of a bench trial, the term encompasses matters placed before the trial court up to the point that the court has reached a decision on the merits of the case. As the Third Circuit has observed, "[w]hile

authority is sparse as to what constitutes presenting a defense 'at' the trial, it would appear that the defense must be presented so that the court may consider whether there has been a failure to state a claim before disposition on the merits." *Weaver v. Bowers*, 657 F.2d 1356, 1360 (3d Cir. 1981).

In the present case, although Gaston's challenge to the sufficiency of the plaintiffs' notice letter was raised about two years after the district court had concluded hearing evidence in the case, Gaston nevertheless made this argument before the district court disposed of the merits of the plaintiffs' complaint. Therefore, Gaston did not waive this defense, but adequately preserved it under the requirement of Rule 12(h)(2) that challenges to the legal sufficiency of a claim must be raised "at trial," if not before. *See id.*; *see also Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 871 (4th Cir. 1999.); *Weatherhead v. Globe Int'l, Inc.*, 832 F.3d 1226, 1228 (10th Cir. 1987).

Because we conclude that Gaston's defense was timely raised, we need not determine whether the mandatory notice requirement of § 1365(b)(1)(A) is "jurisdictional in the strict sense of the term." *See Hallstrom*, 493 U.S. at 31. Therefore, we turn to consider whether the plaintiffs' notice letter complied with the requirements of 40 C.F.R. § 135.3(a).

This regulation provides, in relevant part, that the notice "shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated." 40 C.F.R. § 135.3(a). Notice given by a citizen plaintiff under the Clean Water Act thus must provide the alleged violator with enough information to attempt to correct the violation and avert the citizen suit. *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000); *see Atl. States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997)(holding notice sufficient under Clean Water Act when notice asserted violation of

specific permit requirement but did not specify a particular source point of non-compliance).

In the present case, none of the Phase I discharge violations that the district court found concerned pollutants identified by the plaintiffs in their notice letter. Therefore, because the plaintiffs failed to comply with the requirements of 40 C.F.R. § 135.3(a) in their notice letter with regard to the Phase I limits, this portion of their claim cannot survive Gaston's challenge to the adequacy of that notice.

With regard to the alleged Phase II violations, the notice letter alleged violations for pH and copper but did not include alleged violations for cadmium, zinc, iron, or oil and grease. Thus, at the outset, the plaintiffs' failure to allege Phase II violations for cadmium, zinc, iron, or oil and grease in their notice letter rendered their claims for these alleged violations subject to Gaston's attack on the adequacy of the notice letter, and requires reversal of the Phase II violations that the district court found involving these pollutants.

With regard to the alleged violations for pH and copper, Gaston argues that these alleged violations of the Phase II limitations were premature when the plaintiffs sent their notice letter, because Gaston was given until April 1993 to begin complying with the Phase II standards. We disagree with Gaston on this point, because at the time the plaintiffs sent their notice letter in July 1992, Gaston's permit had not been amended to extend the compliance date for the Phase II standards. Rather, at the time the plaintiffs sent their notice letter, Gaston still was operating under a permit that set June 1992 as the deadline for compliance with Phase II limitations.

The fact that the permit was amended about nine months later in March 1993, to provide Gaston until April 2, 1993 to comply with the Phase II limits, did not shield Gaston from the specific Phase II violations alleged in the plaintiffs' notice letter. The sufficiency of the plaintiffs' notice letter must be

assessed based on the facts that existed in July 1992, not on facts that developed several months later. Therefore, we conclude that the plaintiffs' notice letter sufficiently alleged violations of the Phase II limitations for pH and copper.[2]

The district court found that Gaston had violated its Phase II permit limitations for copper on October 5, 1993 and on March 22, 1994. The district court additionally found that Gaston had violated its Phase II permit limitations for pH on October 15, 1993. Because the plaintiffs' notice letter sufficiently alleged ongoing violations relating to these pollutants, the three particular violations identified above do not suffer from the notice deficiency affecting the other Phase II violations that the district court found.

We next conclude that the allegations of the plaintiffs' notice letter were insufficient to claim that Gaston had committed monitoring and reporting violations. As stated above, the notice letter merely recited that "there appear to be instances in which the facility has failed to comply with the monitoring and reporting requirements of the permit." Thus, in the absence of information indicating the nature or the dates of such reporting and monitoring violations, Gaston was not given adequate notice of those alleged violations.

Our conclusion is not altered by the fact that when the plaintiffs sent their notice letter, they did not have access to

---

[2]Exhibits in the record demonstrate that in May 1992, DHEC informally extended Gaston's deadline for compliance with the Phase II limits until October 1992. Later in May 1992, DHEC issued a draft modification of Gaston's permit extending the June 1992 compliance date until March 1993. However, this draft modification was not effective until DHEC amended the permit in March 1993. While these facts led the district court to hold Gaston not liable for violations of Phase II limits before April 1993, the informal extensions given by DHEC do not affect the adequacy of the notice letter. That letter informed Gaston of current and ongoing violations of its "approved permit" for Phase II limits regarding pH and copper. *See* 33 U.S.C. § 1365(a)(1), (f)(6).

information that they later acquired in discovery in this case. The plaintiffs' lack of information before their suit was filed cannot excuse the deficiencies in the notice letter, because those deficiencies prevented attainment of the legislative objectives of encouraging pre-suit governmental involvement and securing violator compliance. *See Hallstrom*, 493 U.S. at 29.

Accordingly, we hold that the district court erred in finding violations that were not alleged specifically in the plaintiffs' notice letter. These erroneous findings include all violations of Phase I effluent limits that the district court found; all violations of Phase II effluent limits that the district court found with the exception of three violations for pH and copper discussed above; and all the findings of reporting and monitoring violations.

## IV.

Finally, we turn to consider Gaston's argument that the district court lacked subject matter jurisdiction to assess penalties for "wholly past" violations of Gaston's permit. Gaston challenges the district court's decision finding Gaston liable for 54 days of violations relating to its failure to timely submit its final improvement plans. Gaston argues that because it submitted those plans on December 23, 1991, any violation of the various deadlines had concluded before the plaintiffs filed their complaint in September 1992.

The plaintiffs argue, however, that Gaston's violations were ongoing when the plaintiffs filed their complaint. Addressing the content of the compliance schedule, the plaintiffs contend that the schedule required Gaston to meet the Phase II limitations by June 1992, and that Gaston violated these limitations until March 1993, several months after the complaint was filed.

We disagree with the plaintiffs' arguments. The arguments are unresponsive to the issue raised by Gaston, because they

involve different alleged permit violations, rather than Gaston's violation of the filing deadlines for submitting its schedule of compliance.

In considering the merits of Gaston's argument, we observe that a district court has subject matter jurisdiction over claims in a citizen suit filed under the Clean Water Act that are based on good-faith allegations of a defendant's ongoing violation of the Act. *Gwaltney*, 484 U.S. at 64. We have instructed that a citizen plaintiff can prove an ongoing violation:

> (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.

*Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 890 F.2d 690, 693 (4th Cir. 1989). We also explained, however, that penalties may not be imposed for "wholly past violations" of one permit requirement even though violations of a separate permit requirement are ongoing. *Id.* at 698.

The record before us shows that Gaston did not meet its September 1, 1991 deadline for filing its final improvement plans. Sixteen days later, on September 17, 1991, DHEC granted Gaston's request for an extension of that deadline, and amended Gaston's permit to reflect a new deadline of November 15, 1991. DHEC later granted Gaston another extension to submit its final improvement plans until December 15, 1991, but did not further modify the terms of Gaston's permit.

When Gaston submitted its final plans on December 23, 1991, Gaston was in violation of the November 15, 1991 deadline in the amended permit for 38 days. However, after submitting those plans on December 23, 1991, Gaston was no longer engaged in any ongoing violation relating to this sub-

mission requirement. Thus, at the time the plaintiffs filed their complaint in July 1992, Gaston's violation of this submission requirement in the permit was "wholly past."

The fact that Gaston's violation of the Phase II effluent limitations continued beyond the date that the complaint was filed, and beyond the deadline imposed in the initial schedule of compliance, does not affect our conclusion. Gaston's alleged violation of these effluent limitations constituted separate permit violations, which did not impact the "wholly past" nature of Gaston's violations for failing to timely submit its schedule of compliance. *See Gwaltney*, 484 U.S. at 64. Accordingly, we hold that the district court lacked jurisdiction to impose penalties for the 54 days involving schedule of compliance violations that were "wholly past" at the time the plaintiffs filed their complaint.

V.

In conclusion, we hold that the plaintiffs maintained standing throughout their suit in the district court; that based on the legal insufficiency of portions of the notice letter, the district court erred in finding violations and imposing penalties for all but the three violations for pH and copper discussed above; and that the district court erred in assessing penalties for 54 days of violations that were "wholly past" when the plaintiffs filed their complaint. Accordingly, we affirm the part of the district court's judgment relating to the Phase II violation for pH occurring on October 15, 1993, and to the Phase II violations for copper occurring on October 5, 1993 and March 22, 1994, and the accompanying penalties imposed for those three violations; we reverse the balance of the district court's findings of violations and the court's imposition of penalties for those violations; and we remand the case for further proceedings consistent with our opinion.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*